## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **COACH INC., AND** | ) | |
| **COACH SERVICES, INC.** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | **CIVIL ACTION FILE** |
| **VS.** | ) | |
| | ) | **NO. 1:10-CV-02746-JOF** |
| **KIM'S MANAGEMENT, INC** | ) | |
| **METRO MART USA  AND** | ) | |
| **MUYOUNG KIM** | ) | |
| | ) | |
| **DEFENDANTS,** | ) | |

_____

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiffs, Coach, Inc. and Coach Services, Inc., (collectively, "Coach") submit this brief in support of their motion for summary judgment as Coach's claims for Contributory Trademark Infringement, Vicarious Copyright Infringement, and Contributory Copyright Infringement,  and respectfully show the Court as follows.

### <u>Introduction</u>

This case concerns the widespread, long-term, illegal sale of counterfeit Coach merchandise at Kim's Metro Mart Flea Market ("Kim's Flea Market") in

1

Atlanta, Georgia.  Defendants include Kim's Flea Market, as well as its' owner, who despite repeated warnings and police actions continued to allow the illegal conduct.  For years, Kim's Flea Market was known as the place in the Southeast where anyone could buy counterfeit merchandise – particularly counterfeit Coach merchandise.  Beginning in 2005, law enforcement and private investigators working on behalf of many brands, including Coach, conducted raids at the flea market and notified Mr. Kim of the risk of continuing to allow counterfeit merchandise to be sold at Kim's Flea Market.  For years, Mr. Kim ignored private investigators, trademark holders, and even federal law enforcement agents, and allowed the activity to continue while racking in a profit.

Over the course of six years, more than seven thousand counterfeit products were seized at Kim's Flea Market, over fifteen hundred of which were counterfeit Coach handbags, wallets, and accessories.  During each raid, law enforcement would notify Mr. Kim and his management staff that counterfeit goods were continuing to be sold on his property, and would warn him of the dangers associated with such conduct.  Shockingly, the sale of counterfeit merchandise was so profitable and widespread, off-duty police officers were hired by the vendors to serve as 'look-outs' and notify vendors when law enforcement entered the premises.  In 2009, the sale of counterfeit merchandise was so rampant a Special

Agent with Immigration and Customs Enforcement ("ICE"), a division of the

Department of Homeland Security, sat down with Mr. Kim and conducted a

PowerPoint presentation regarding IPR enforcement and the illegal sale of

counterfeit merchandise.   Mr. Kim's response to ICE and their training typify his

disregard for the law.  Specifically, in response to their training, Mr. Kim took no

affirmative steps to rid the market of counterfeit merchandise, even though he was

under a legal obligation to do so.

In 2010, Coach sent Mr. Kim a cease and desist letter stating "If you

facilitate the continuation of this conduct by failing to prevent the ongoing criminal

enterprise on your property, Coach intends to hold you responsible for all damages

and fees incurred as a result".  Yet still, Mr. Kim took no action and counterfeit

Coach merchandise continued to be sold at Kim's Flea Market.

Defendants' blatant disregard of the law is evident.  It was apparent in 2005

when Mr. Kim learned that counterfeit Coach merchandise was being sold at

Kim's Flea Market, but he refused to take action.  And in 2009 when multiple raids

were conducted with law enforcement and thousands of counterfeit items were

seized a---Mr. Kim still took no action.  In 2010 Mr. Kim received training by ICE

regarding trademark counterfeiting and Coach sent him a cease and desist letter,

but still the illegal activity continued.  Mr. Kim knew of, profited from, and

actively abetted the extensive counterfeiting at Kim's Flea Market.  Accordingly,

Mr. Kim should be held liable pursuant to the controlling law.

### Brief Statement of Material Facts

A. <u>The Coach Brand</u>

Coach began producing leather products under the Coach mark in 1941, and

is a worldwide leader in the design, marketing, and sale of high-end fashion

products (*Walden Decl.¶3, ¶6*).  Coach's dedication to producing high-quality,

innovative products quickly propelled the brand to become an American icon

(*Walden Decl. ¶3*). Today, Coach products are not only instantly recognized by the

American public, but also by international citizens (*Walden Decl. ¶4*).  Both

domestic and foreign Coach Customers do not hesitate to pay full retail prices for

genuine Coach Products, because they know that they embody a unique blend of

high-end fashion and style, impeccable craftsmanship, and functionality.  (*Walden*

*Decl. ¶5*).  For the past several years, Coach has continually achieved annual sales

volumes in excess of three billion dollars  (*Walden Decl. ¶6*).  As such, Coach's

Trademarks, and the goodwill associated with them, are extraordinarily valuable.

B. <u>The Coach Intellectual Property</u>

Coach incorporates a variety of trademarks and copyrighted designs into its products  (*Walden Decl. ¶9*).  Coach merchandise generally includes at least one Coach trademark and often contain multiple trademarks and copyrights. *Id.*  All Coach trademarks are registered with the US Patent and Trademark Office (*Walden Decl. ¶8*).  All Coach copyrights are registered with US Copyright Office. *Id.*  Defendants have stipulated that Coach owns valid registrations to the Coach trademarks and Coach copyrights.

<u>History of Counterfeiting at Kim's Flea Market</u>

In 2005, an investigator working on behalf of Coach went to Kim's Flea Market and observed at least thirty booths selling counterfeit merchandise.  (Grooms Depo. P. 44 Lines 8-15).  Later that same year, law enforcement, working with Coach's investigator, conducted a raid and arrested thirteen vendors for selling counterfeit merchandise and seized thousands of counterfeit items.  (Grooms Depo. P. 46 Line 1 - P. 47 Line 9).  Amongst the items seized were more than 400 counterfeit Coach handbags and 40 counterfeit Coach wallets.  (Grooms Depo. P. 46 Line 1 - P. 47 Line 9).  During the raid Coach's investigator notified Mr. Kim

of the risks involved in allowing counterfeit merchandise to be sold. (Grooms Depo. P. 48 Line 11 - P. 49 Line 13).

The following year, in March of 2006, another police action occurred at Kim's Flea Market. (Grooms Depo. P. 80 Lines 22-25). Over forty vendors were openly displaying and offering for sale counterfeit merchandise – six of whom were offering for sale counterfeit Coach merchandise. (Grooms Depo. P. 80 Line 11-17; P. 89 Line 8-10). Grooms also pointed out false walls and hidden rooms that were being used to store counterfeit merchandise. (Grooms Depo. P. 90 Lines 16 – P. 91 Line 1).

In 2007, Kim's Flea Market hired off-duty City of Atlanta police officers to provide security for the market. (Kim Depo. P. 85 Lines 7-19). At another point, vendors at Kim's Flea Market were permitted to hire their own "security." (Chung Depo. P. 57 Line 23 – P. 58 Line 15). The vendors hired off-duty Fulton County police officers who were there to protect the vendors – allowing the counterfeit trade to flourish.[1] (Chung Depo. P. 57 Line 16 – P. 58 Line 15).

---

[1] In 2010, both the Fulton deputies and the City of Atlanta police officers were ordered to stop working at Kim's Flea Market due to illegal activity, including the sale of counterfeit merchandise, occurring at Kim's Flea Market (Stapler Depo. P. 140 Line 22 – P. 141 Line 12; Hunt Depo. P. 20 Lines 15-21).

Nearly three years later, in February of 2009 another investigator working on behalf of Coach found that counterfeit merchandise was continuing to be sold at the flea market. (Escher Depo. P. 77 Lines 8-25).  On or about June 18, 2009, law enforcement raided four booths at Kim's Flea Market seizing nearly five thousand counterfeit items.  (Stapler Depo. Ex. 60).  One booth alone had more than 835 counterfeit Coach handbags, 238 counterfeit Coach scarves, 91 counterfeit Coach wallets, and 92 pair of counterfeit Coach shoes seized.  (Escher Depo. P. 83 Lines 11-13; Walden Depo. Ex. 35).  During the raid, six other booths were identified as having counterfeit merchandise for sale, but could not be raided. (Escher Depo. P. 61 Line 6-18).  Law enforcement notified the management at Kim's Flea Market that the raid was occurring. (Stapler Depo. P. 27 Lines 5-21).

On or about December 18, 2009, the city of Atlanta Police Department conducted yet another raid of Kim's Flea Market.  Hundreds of counterfeit items were seized from two booths including over 130 counterfeit Coach handbags. (Stapler Depo. Ex. 63).

On February 15, 2010 the City of Atlanta sent a letter to Mr. Kim putting him once again on notice of counterfeiting that was occurring at Kim's Flea Market.  The letter stated:

> "This location [1919 Metropolitan Parkway SW.  Atlanta, GA] known location where one can purchase illegal/counterfeit merchandise (i.e. handbags and clothing)….Please be advised that, in accordance with Federal Statutes, should the Atlanta Police Department Return to 1919 Metropolitan Parkway SW, Atlanta, GA. Find the same person(s) in control, find additional contraband, find through surveillance of the property, that the property is being used for the sale, possession, of counterfeit merchandise, we will ask the United States Justice Department to proceed under the appropriate Federal Statute to seize the property….Please consider this as notification of criminal misconduct involving before mentioned illegal activity at the above address."

(Kim Depo. Ex. 13; P. 64 Line 24 – P. 67 Line 12).  Even the threat of criminal forfeiture was insufficient to convince Mr. Kim to take action. (Kim Depo. P. 66 Lines 6-9).

The next month law enforcement raided Kim's Flea Market for at least the fifth time.  Like previous raids, more than two hundred counterfeit Coach handbags were seized.  (Stapler Depo. Ex. 64-66).

On May 4, 2010, Coach sent its own cease and desist letter to Mr. Kim notifying him of the illegal activity that was occurring at his flea market. Specifically Coach stated "If you facilitate the continuation of this conduct by failing to prevent the ongoing criminal enterprise on your property, Coach intends to hold you responsible for all damages and fees incurred as a result."   (Kim Depo.

Ex. 13).  Mr. Kim did not read the letter and took no action regarding the sale of counterfeit Coach merchandise. (Kim Depo. P. 74 line 14 – 75 line 2).

Two days later, the Atlanta Police Department seized hundreds of counterfeit items from a booth at Kim's Flea Market – including approximately 87 counterfeit Coach handbags and scarves. (Stapler Ex. 67). During that raid, it was observed that nearly 90 percent of the booths at Kim's Flea Market were selling counterfeit merchandise  (Ginn Depo. P. 95 Lines 15-24).

On May 25, 2010 the City of Atlanta sent yet another letter to Mr. Kim regarding the sale of counterfeit merchandise at Kim's Flea Market stating that Kim's Flea Market is a "known location where one can purchase illegal/counterfeit merchandise (i.e. handbags and clothing)." (Kim Ex. 13; Depo. P. 76 Line 14 – 77 Line 21).  Mr. Kim took no action. (Kim Ex. 13; Depo. P. 76 Line 14 – 77 Line 21)

This lawsuit was filed in September of 2010.  After Plaintiffs received a TRO freezing Mr. Kim's assets, and after years of profiting from the illegal activity, for the first time, Mr. Kim finally took action. Defendants hired a private investigator to survey Kim's Flea Market.  (Kim Depo. 99 lines 22-25). The investigator found that nearly 100% of the vendors were selling counterfeit

merchandise.  (Bell Depo. P. 91 line 6 – P. 92 line 9). Mr. Kim evicted the vendors leaving the flea market nearly empty.  (Bell Depo. P. 88 Lines 21-24).

## Argument and Citation to Authority

A. Summary Judgment Standard

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The court reviews the evidence and all factual inferences in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law.  *MacKenzie v. City of Rockledge,* 920 F.2d 1554, 1558 (11th Cir.1991).  The "moving party" bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party carries its burden, the burden shifts to the nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor. *Celotex,* 477 U.S. at 323.  "At this stage the nonmoving party 'may not rest upon mere allegation or denials of

10

[the movant's] pleading, but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trail." *Celotex,* 477 U.S. at 323, quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).   An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Anderson*, 477 U.S. at 248 (1986); *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir.1992). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*  Further, "a mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990) *(citing Anderson,* 477 U.S. 242.)

B. <u>The Defendants are Liable because Counterfeiting Occurred at Kim's Flea Market</u>

To be liable for contributory trademark infringement, direct infringement must first be found.  *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.* 591 F.Supp.2d 1098, 1111 (2008).   Under the Lanham Act, a plaintiff must show "(1) that it had prior rights to the mark at issue and (2) that the defendant had adopted a mark or name that was the same, or confusingly similar to its mark, such that

consumers were likely to confuse the two." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.,* 106 F.3d 355, 360 (11th Cir.1997) (citing *Conagra Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984).

*i) Coach has Rights and Valid Registrations in the Coach Trademarks.*

Not only has Coach taken the necessary steps to register the Coach trademarks, but Defendants have stipulated that Coach owns valid registrations for the Coach trademarks.  The first element for trademark infringement is met.

*ii)  The Merchandise Seized from Kim's Flea Market uses Marks that are Identical to the Coach Trademarks.*

It is not, and cannot be disputed, that merchandise bearing the Coach trademarks was sold at Kim's Flea Market.  Below are photographs ,bates stamped Coach 2567 and Coach 2572 (See Escher Depo. Ex. 71),which are of merchandise being offered for sale during the June 2009 raid.  It is clear that the marks are identical.



It is obvious that the vendors at Kim's Flea Market used marks identical to Coach's registered trademarks, therefore the second element for trademark infringement is met.

*iii)  The use of counterfeit marks on the goods at Kim's Flea Market presumes a finding of confusion.*

The standard for infringement under the Lanham Act is "likelihood of confusion." 15 U.S.C. §§ 1114(1)(a) & 1125(a)(1)(A) (2006); *See, e.g., Two Pesos,*

*Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992); *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44,  45–46 (5th Cir. 1975).  A finding that these items are counterfeit leads inexorably to the conclusion that the sale of such items creates a likelihood of confusion as to source or origin.  While many factors are typically considered in determining whether marks are confusingly similar[2], [*see, e.g., Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d *1160 (1982)].,* where the trademark owner and the alleged infringer are selling competing products, as is the case here, the court need only compare the marks to determine whether there has been infringement. *See The Topps Co. v. Gerrit J. Verburg Co.*, 41 U.S.P.Q.2d 1412, 1417 (S.D.N.Y. 1996).  As one court aptly put it:

> It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiffs registered marks appear in their entirety. Under these circumstances, the likelihood of consumer confusion, mistake or deception is clear.

*Microsoft Corp. v. CMOS Techs., Inc.*, 872 F. Supp. 1329, 1335 (D.N.J. 1994).

---

[2] Those factors are:  (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. *Id.*

In the instant case, the marks above are exact copies of Coach's trademarks.

Where an individual is utilizing exact copies of Coach's trademarks on

substantially the same types of products in substantially the same manner, *the*

*likelihood of confusion must be presumed. VMG Enterprises, Inc. v. F. Quesada*

*& Franco, Inc.,* 788 F. Supp. 648 (D.P.R. 1992) (emphasis added) *(citing Polo*

*Fashions, Inc. v. Fernandez,* 655 F. Supp. 664 (D.P.R. 1987)); *Polo Fashions v.*

*Craftex, Inc.,* 816 F.2d 145, 148 (4th Cir. 1987) (holding that a presumption of a

likelihood of confusion arises when counterfeit symbols are substantially identical

to genuine symbols and are used in the same manner as the genuine symbols are

used).  "Where a counterfeit item is virtually identical to the genuine item, the

'very purpose of the individuals marketing the cheaper [counterfeit] items is to

confuse the buying public into believing that it is buying the true article.'" *Fila*

*U.S.A., Inc. v. Nam Joo Kim,* 884 F. Supp. 491, 494 (S.D. Fla. 1995) (citing *In re*

*Vuitton et Fils S.A.,* 606 F.2d 1, 4 (2d Cir. 1979)).  It is hard to imagine greater

similarity than the Defendants' use of the exact copies of the Coach Trademarks on

the counterfeit goods, thus a likelihood of confusion must be found.

C. <u>Kim's Flea Market is Contributorily Liable for trademark Infringement</u>

Modern liability for contributory trademark infringement is founded upon

the notion that "trademark infringement can extend beyond those who actually

mislabel goods with the mark of another." *Inwood Labs v. Ives Labs*, 456 U.S. 844, 853 (1982). The *Inwood Labs* test for contributory trademark infringement "applies on its face to manufacturers and distributors of goods. Courts have, however, extended the test to providers of services." *Tiffany Inc. v. eBay, Inc.*, 600 F.3d 93, 104 (2d Cir. N.Y. 2010). Both the Seventh and Ninth Circuits, as well as various district courts, have applied the *Inwood Labs* test for contributory trademark infringement to flea market operators. *Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143 (7th Cir. 1992); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), *Coach Inc v. Gata Corp*. 2011 U.S. Dist. LEXIS 62317 (D.N.H. June 9, 2011).

In *Hard Rock*, the Seventh Circuit applied the *Inwood Labs* test to a flea market operator whose vendor was selling counterfeit goods. *Hard Rock*, 955 F.2d at 1143. The *Hard Rock* Court addressed the distinction between a product and a service. *Id*. The *Hard Rock* court found that:

> the Restatement of Torts tells us that [the defendant] is responsible for the torts of those it permits on its premises 'knowing or having reason to know that the other is acting or will act tortiously …' Restatement (Second) of Torts § 877 (c) & cmt. d (1979). The common law, then, imposes the same duty on landlords and licensors that the Supreme Court has imposed on manufacturers and distributors. In the absence of any suggestion that a trademark violation should not be treated as a common law tort, we believe that the *Inwood Labs*. test for

> contributory liability applies.   [The defendant] may be liable for trademark violations by (the vendor) if it knew or had reason to know of them.

*Hard Rock*, 955 F.2d at 1149.

With respect to the "reason to know" component of the knowledge prong, the *Hard Rock* court found that a flea market operator is required "to understand what a reasonably prudent person would understand." *Id*.  And since "willful blindness is equivalent to actual knowledge for purposes of the Lanham Act," the court also noted that a finding of willful blindness should be enough to hold a flea market operator liable for counterfeit sales of its vendors.  *Id*.   The *Hard Rock* court explained that "[t]o be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate." *Id*.  The *Hard Rock* court also provided and discussed some examples of evidence that could support a finding of willful blindness, including the fact that the manager of the flea market had the opportunity to see the counterfeit [merchandise]'s cut labels and low sale price, from which the manager could have reasonably concluded that the goods were counterfeit.  *Id*.

A few years later, the Ninth Circuit addressed contributory liability again. In *Fonovisa*, plaintiffs brought a copyright and trademark action against operators of a flea market (or swap meet), where "third-party vendors routinely sell

counterfeit recordings that infringe on the plaintiff's copyrights and trademarks."
*Fonovisa*, 76 F.3d at 260.  In *Fonovisa*, the defendants, in exchange for daily rental
fees, provided advertising, parking, and some minimal supervision of the premises.
*Id.*  Of particular note, the plaintiff in *Fonovisa* alleged that "in 1991, the Fresno
County Sheriff's Department raided the Cherry Auction swap meet and seized
more than 38,000 counterfeit recordings.  The following year, after finding that
vendors at the Cherry Auction swap meet were still selling counterfeit recordings,
the Sheriff sent a letter notifying Cherry Auction of the on-going sales of
infringing materials, and reminding Cherry Auction that they had agreed to provide
the Sheriff with identifying information from each vendor.  In addition, in 1993,
Fonovisa itself sent an investigator to the Cherry Auction site and observed sales of
counterfeit recordings."  *Id*. at 261.  Concluding that the plaintiffs had stated a
claim for contributory trademark infringement against the operators of the flea
market, the *Fonovisa* Court found that the operators of the flea market were
"supplying the necessary marketplace for [the sale of counterfeit goods] in
substantial quantities.  *Id*. at 265.  The *Fonovisa* Court made plain that "*Hard
Rock Café's* application of the *Inwood* test is sound; a swap meet cannot disregard
its vendors' blatant trademark infringements with impunity."  *Id*.

As the Ninth Circuit explained:

> *Hard Rock* and *Fonovisa* teach us that when measuring and weighing a fact pattern in the contributory infringement context without the convenient 'product' mold dealt with in *Inwood Labs*, we consider the extent of control exercised by the defendant over the third party's means of infringement … Direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark permits the expansion of *Inwood Lab.'s* 'supplies a product' requirement for contributory infringement.

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999).

Moreover, "once a defendant flea-market operator is notified of trademark violations taking place on its premises, it cannot claim innocence from contributory liability."  Deborah F. Buckman, J.D., *Liability as Vicarious or Contributory Infringer Under Lanham Act – Modern Cases*, 152 A.L.R. Fed. 573 (1999).

Recently, in *Coach Inc. v. Gata Corp.*, 2011 U.S. Dist. 45045 (D.N.H. Apr. 26, 2011) (granting summary judgment); 2011 U.S. Dist. LEXIS 62317 (D.N.H. June 9, 2011) (reaffirming on motion for reconsideration), the District of New Hampshire granted summary judgment to Coach on virtually identical facts.  In *Gata*, counterfeit Coach merchandise had been offered for sale at the flea market since 2005, and law enforcement along with investigators from Coach had conducted numerous seizures and surveys documents the extent of counterfeiting at the flea market.  Although the owner had posted a sign stating 'No Coach purses

19

sold here' and conducted walk-throughs of the premises counterfeit Coach

merchandise was still being offered for sale.  The court found that the steps the flea

market operator took to rid the market of Coach counterfeits was insufficient and

that the owner had knowledge that counterfeit Coach was being sold at the

property.  Specifically, the *Gata* court found that the defendants had sufficient

knowledge to be legally culpable:

> once law-enforcement agencies began raiding the Flea Market,
> arresting vendors, and seizing counterfeit merchandize, any lack of
> specific knowledge on defendants" part could only have resulted from
> willful blindness; those raids provided defendants with a veritable
> roadmap to infringing vendors and merchandise.

*Gata* LEXIS at 62317.

Under the Lanham Act and relevant case law, including *Gata*, Kim's Flea

Market is liable for contributory infringement once the market is aware of illegal

counterfeiting on its premises and fails to take action.

Under *Hard Rock*, Kim's Flea Market is assumed to "understand what a

reasonable prudent person would understand" and take appropriate action to avoid

liability.  *Hard Rock*, 955 F.2d at 1149.  The court in *Gata* continued, "either a

deliberate failure to investigate or a purposeful contrivance to avoid learning of

infringing activity is sufficient to establish willful blindness."  *Gata* LEXIS at

62317.  The evidence clearly demonstrates that the sale of counterfeit Coach

merchandise was open and notorious at Kim's Flea Market and Mr. Kim and his management knew that counterfeit Coach merchandise was being sold.  Mr. Kim first learned that counterfeit merchandise was being sold at Kim's Flea Market in 2005, when an investigator from Coach informed him of such. (Grooms Depo. P. 48 Line 11 – P. 49 Line 13) Reasonable measures were not taken to rid itself of counterfeit merchandise.  In 2006 substantial police action occurred: vendors were arrested, merchandise was seized, and Mr. Kim. (Grooms Depo. P. 80 Lines 22-25).  In 2009, 95% of the vendors were selling counterfeit merchandise. (Ginn Depo. Ex. 31 – Depo. P. 108 line 6-14).  In June of 2009 over 5,000 counterfeit items were seized from Kim's Flea Market – with more than 1,000 of them bearing the Coach trademarks and copyrights. (Stapler Depo. Ex. 60 – Walden Depo. Ex. 35). During this raid, law enforcement spoke with the management at Kim's Flea Market regarding the continuing sale of counterfeit merchandise. (Stapler Depo. P. 27 Lines 5-21).

In February 2010, in an effort to stop Mr. Kim's illegal activity, officials from ICE met with Mr. Kim and gave him a presentation on intellectual property infringement and the potential liability for selling counterfeit merchandise.  The presentation included information on popularly counterfeited brands – including Coach. (Kim Depo. P. 68 Line 6 – P. 69 Line 6; Ex. 14).

Also in 2010, Mr. Kim received two letters from the City of Atlanta regarding the on-going sale of counterfeit merchandise at the flea market.  (Kim Depo. Ex. 13).  The letters specifically stated that Mr. should be "consider this as notification of criminal misconduct involving before mentioned illegal activity at the above address" (Id.).  Mr. Kim received both letters and took no action (Kim Depo. P. 68 Lines 1-5).   Coach also sent Mr. Kim a letter informing him that Coach would hold him liable for the acts at Kim's Flea Market if he did not take the appropriate stepts to prevent the sale of counterfeit Coach merchandise.  In fact, in his deposition, Mr. Kim admitted that he did not read the letter (Kim Depo. P. 76 Line 14 – P. 77 Line 21).  During 2010, hundreds of counterfeit Coach items were seized by law enforcement.  During each seizure, management at Kim's Flea Market were informed of the seizure.  Still – Mr. Kim and Kim's Flea Market took no action.

It is beyond dispute that Mr. Kim and Kim's Flea Market knew that counterfeit Coach merchandise was being sold at Kim's Flea Market.  They knew about it for years, and for years they ignored the problem.

D. <u>Kim's Flea Market is Liable for Vicarious and Contributory Copyright Infringement</u>

22

In addition to trademark infringement, defendants' are also liable for copyright infringement.  Although the Copyright Act does not grant express liability for anyone other than direct infringers, courts have found that secondary liability exists.  *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 435, 104 S.Ct. 774, 785, 78 L.Ed.2d 574 (1984) (explaining that "vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying circumstances in which it is just to hold one individually accountable for the actions of another").

### a) Direct Infringement

To bring a claim for secondarily liability in a copyright matter, plaintiff must first prove direct infringement. (*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F.Supp.2d 1098, 1111 (2008).  "To establish direct infringement, a plaintiff must show that (1) the plaintiff owns the copyright or copyrights at issue; and (2) the third party infringed the copyrights by unauthorized copying or distribution."  See *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005); *Arista Records LLC v. Lime Group LLC*, 2011 U.S. Dist. LEXIS 47455 (S.D.N.Y. Apr. 28, 2011).

23

a. <u>Ownership of a Valid Copyright</u>

Defendants have stipulated that Coach owns the eight copyrights at issue in this litigation.  Therefore, the first element of direct infringement has been met.

b. <u>The Vendors Infringed Coach's Copyrights by Selling merchandise bearing the Coach Copyrights.</u>

Photographs taken during the various raids at Kim's Flea Market clearly show merchandise bearing the Coach copyrights being offered for sale.   (Stapler Ex. 60, 62-68; Escher Ex. 71; Walden Ex. 46)  Coach has never given a license or allowed any third party to use the Coach copyrights in connection with the distribution or sale of its products (*Walden Decl. ¶17(b)*).  The vendors' sale of merchandise bearing the Coach copyrights was unauthorized. The second element for copyright infringement is met.

*ii) Vicarious Copyright Infringement*

Vicarious copyright infringement is established with a two-part test. A plaintiff must show that the defendant had 1) the right to and ability to supervise the premises and 2) obtained a direct financial benefit from the infringing activity. *Fonovisa*, 76 F.3d at 262.

a. <u>Kim's Flea Market had the Right to Supervise and Control the Premises</u>

24

Where a flea market has the ability to inspect its vendors merchandise and remove the vendor for having infringing merchandise the requisite level of control is present. See *Arista Records, Inc. v. Flea World, Inc.*, 2006 U.S. Dist. LEXIS 14988, 29-31 (D.N.J. Mar. 31, 2006) (citing *Fonovisa*, supra and *UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993 (E.D. Cal. 2004)).

In this case, management at Kim's Flea Market had the ability to remove tenants and inspect vendors' merchandise. (Kim Depo. Ex. 11 –MET315, MET282). Additionally, management for Kim's flea market controlled the hours of flea market operation (Kim Depo P. 63 line 13 – P. 64 line 13), walked around the premises,(Chung Depo. P. Line 22 – P. 86 Line 5), organized the market (Kim Depo. P. 15 Lines14 – 23), and provided utilities to the vendors. (Kim Depo. Ex. 11). Under the holding in *Arista*, the first element of vicarious liability is easily met.

           b. <u>Kim's Flea Market had a financial interest in the sale of counterfeit merchandise at its market.</u>

"The essential aspect of the 'direct financial benefit inquiry' is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . . *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F. Supp. 2d 1098, 1110 (N.D. Cal. 2008) (citation omitted). In *Arista Records*,

the court found that the receipt of rent from the vendors selling infringing goods was a direct financial benefit.

In early 2010, Kim's Flea Market had approximately 100 to 120 vendors all of whom paid rent (Kim Depo. P. 16 Lines 6-9). The significant majority of vendors were employed by selling counterfeit merchandise, including Coach (Stapler Depo. P. 37 Lines 12 – 18). Once counterfeit merchandise was no longer sold at Kim's Flea Market, the vendors left, and with that went their rents. It is clear that Kim's Flea Market benefitted financially from the sale of counterfeit merchandise by vendors at the market.

### iii) Contributory Copyright Infringement

"Contributory infringement liability exists if the defendant engages in personal conduct that encourages or assists the infringement activity. Under this standard, knowingly providing the site and facilities for infringing activity is a material contribution." *Louis Vuitton S.A. v. Akanoc Solutions, Inc.,* 591 F. Supp. 2d 1098, 1108 (N.D. Cal. 2008) (quotation marks and citations omitted). Where a flea market operator provides space, parking, and utilities, the requirements for contributory liability are present. CITE. In fact, merely providing the "site and

facilities for known infringing activities is sufficient to establish contributory liability." *Id*.

Kim's Flea Market provided the vendors the facility for their counterfeit goods to be sold. Kim provided parking for customers wishing to visit the flea market. Kim also provided utilities to the vendors.

In *Aimster Copyright Litigation*, the court found that actual knowledge of direct infringement was not required to find contributory copyright infringement *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 654 (N.D. Ill. 2002). "The imposition of contributory liability [only] requires that the secondary infringer know or have reason to know of the direct infringement." *Id*. at 650.

In the present case it is clear that Kim's Flea Market knew – or at the very least – had reason to know of the direct infringement, and nevertheless continued to provide services to vendors allowing for the continued sale of counterfeit Coach merchandise.

E. <u>Mr. Kim is Personally Liable for Contributory Trademark Infringement</u>

Mr. Kim is individually liable for the trademark infringement by his company. "A corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil." *Microsoft Corp. v. Moss*, 2007

U.S. Dist. LEXIS 73672 (N.D. Ga. Sept. 20, 2007) (Forrester, J.) (citing *Babbit Electronics, Inc. v. Dynascan, Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994)). Because of its very nature a corporation can act only through individuals. "Obviously ... if there was an infringement by the corporation, this infringement was caused by some one or more persons either officers or employees of the corporation who caused the acts to be done." *Mead Johnson*, 402 F.2d at 23.  If an individual actively and knowingly caused the infringement, she is personally liable.  *See id.; see also Wilden Pump & Eng'g Co. v. Pressed & Welded Prods. Co.*, 655 F.2d 984, 990 (9th Cir. 1981) (in analogous patent infringement context, individual will be liable if he is "moving, active, conscious force" behind infringement).

In the case at bar, Mr. Kim is the sole shareholder, President, and controlling force of Kim's Management, Inc.  (Kim Depo. P. 12 Lines 15-20).  He makes all decisions at Kim's Flea Market, including the one to continue to allow the sale of counterfeit merchandise.  Consequently, Mr. Kim is personally liable for any secondary infringement attributable to Kim's Management Inc.

F.  Coach is entitled to a Permanent Injunction and Statutory Damages:

Having established Defendant's liability, the question becomes: the appropriate amount of damages and imposition of injunctive relief.

*i). Coach is entitled to statutory damages of at least $7,600,000 for trademark counterfeiting.*

The Lanham Act allows a plaintiff to elect to recover statutory damages or lost profits. Coach has elected to recover statutory damages pursuant to 15 U.S.C. § 1117(c). The Lanham Act authorizes statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just" or "if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c); *see Microsoft Corp. v. Moss*, 2007 U.S. Dist. LEXIS 73672, *20 (N.D. Ga. 2007) (discussing 15 U.S.C. § 1117(c)).[3] In this case it is clear that the Mr. Kim and Kim's Flea Market willfully infringed Coach's rights and as such the court should consider the threshold for damages to be $2,000,000 per mark, per type of good.

---

[3] On October 13, 2008, the Prioritizing Resources and Organization for Intellectual Property Act of 2008 amended 15 U.S.C. § 1117(c) by **doubling** the range of monetary penalties available in civil cases, from $1,000 to $100,000 per counterfeit mark used (an increase from $500 to $50,000), and **doubling** the amount of monetary penalties available in civil cases that are willful up to $2 million (an increase from $1 million).

In 2008, Congress amended the Lanham Act to increase the penalties for trademark counterfeit.  Statutory damages doubled with the maximum now being $2,000,000 per mark, per type of good as opposed to $1,000,000.  In applying the statutory damages provision of the Lanham Act, courts have noted "[t]he 1996 Act limited its textual guidance purposefully…specifically provid[ing] for broad judicial discretion in instructing that 'as the court considers just,' it can order awards anywhere from $500 to $100,000 [now $1,000 to $200,000], with the maximum increasing to $1,000,000 [now $2,000,000] for 'willful' violations." *Sara Lee Corp. v. Bags of New York, Inc.*, 36 F.Supp. 2d 161, 166 (S.D.N.Y. 1999).  Further, the First Circuit has held that "[s]tatutory damages are not meant to be merely compensatory or restitutionary.  The statutory award is also meant to discourage wrongful conduct.  That is why the statute permits consideration of…additional damages where an infringement is willful." *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 195 (1st Cir. 2004).  The Sara Lee court also noted that courts assessing statutory damages in counterfeiting cases should look to the long history of cases applying statutory damages under the Copyright Act. *Id.; see also Commercial Law League of Am., Inc. v. George, Kennedy & Sullivan*, *LLC*, 2007 U.S. Dist. LEXIS 68182, *9 (S.D. TX., 2007) (noting that "courts have found

guidance in an analogous statutory damages provision in the Copyright Act, 17 U.S.C. § 504(c)").

"Statutory damages are most appropriate when infringer non-disclosure during fact finding leaves damages uncertain," as is the case here. *Sara Lee Corp.,* 36 F.Supp. 2d at 165. Moreover, willful infringement such as is present here, is an "aggravating factor in statutory damages inquiries." *Id*. at 168; *see also Playboy Enters. v. Asiafocus Int'l,* 1998 U.S. Dist. LEXIS 10359 (E.D. Va. Feb. 2, 1998) (awarding maximum statutory damage amount in case of "broad, extensive, blatant, and willful" infringement), *adopted, Playboy Enters. v. Asiafocus Int'l,* 1998 U.S. Dist. LEXIS 10459 (E.D.Va. Apr. 10, 1998).

In calculating statutory damages in trademark counterfeiting cases, courts have looked to the cases involving willful copyright infringement for guidance.  In these cases, courts have generally considered the following factors: "(1) the expenses saved and profits reaped; (2) the revenue lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect of others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the Defendant." *Tiffany (NJ) Inc. v. Luban*, 282 F.Supp.2d 123, 125 (S.D.N.Y. 2003)

(*citing Fitzgerald Pub. Co., v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2nd Cir. 1986); *see also Pickett v. Exec. Pref. Corp.*, 2006 U.S. Dist. LEXIS 94651 (M.D. Fla. 2006) (*citing Cable/Home Comm. Corp. v. Network Prods., Inc.*, 902 F.2d 829 (11th Cir. 1990). "The 'statutory rule . . . not merely compels restitution of profit and reparation of injury but also is designed to discourage wrongful conduct.'" *Polo Ralph Lauren. L.P. v. 3M Trading Co*., 1999 U.S. Dist LEXIS 7913, *14 (2d Cir. March 22, 1999).

With respect to the first factor, Coach does not have adequate information to properly state profits made by the direct infringers, and this inability is a factor that leans to a high damage award. Mr. Kim was not helpful in providing information regarding the amount of money collected by the vendors, or any information on the vendors' sales.   Because Coach is unable to determine the actual profits a large statutory award should be given.  Similarly, the second factor – revenue lost by the plaintiff – is indeterminable because Plaintiffs do not know the extent of sales of counterfeit Coach merchandise that occurred at Kim's Flea Market.  The fact that more than 1,600 counterfeit Coach items were seized were criminal actions suggests that an extremely large number of items were sold resulting in a lot of lost revenue to Coach.

As to the third factor, Coach has spent millions of dollars in marketing, product research, development, and manufacture of their high quality products. (*Walden Decl. ¶10*). Coach's trademarks are among the world's most well known. (*Walden Decl. ¶13*). By facilitating the sale of items bearing counterfeit Coach trademarks, the Defendants benefited directly from Coach's huge expenditures of resources and time in the creation, development, and production of their trademarks and the goodwill associated therewith. (*Walden Decl. ¶17(e)*). Likewise, the Defendants reaped the benefit of the millions of dollars invested by Coach in the manufacture, distribution, licensure, promotion, and protection of Coach's products and marks. *Id.*

The fourth and seventh factors also lead to a finding of a high damages award. Awarding substantial statutory damages in this case will have the desired effect of providing the Plaintiffs with a "potent arsenal" of remedies against egregious infringers, like the Defendants and moreover, discourage other potential infringers from engaging in similar conduct. *See Engel v. Wild Oats, Inc.*, 644 F. Supp. 1089 (S.D.N.Y. 1986); *U. Features Syndicate, Inc. v. Sunrise Mold Co*., 569 F. Supp. 1475 (S.D. Fla. 1983) (applying the analogous Copyright Act statutory damage provision). If this Court were to award only nominal damages, these Defendants, and others similarly situated, would merely factor this cost in their

future infringing activities.  The granting of substantial statutory damage awards at this time will also deter others from violating the Plaintiffs' exclusive rights.[4] *See Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 501 (C.D. Cal. 2003) (noting that in considering an award of statutory damages under the Lanham Act in a default situation deterrence of future infringements must be considered).

There is no doubt that Mr. Kim's actions in this case were willful.  After the 2005 raid, Mr. Kim was on notice that counterfeit Coach merchandise was being sold at Kim's Flea Market.  Yet Mr. Kim took no action to stop the sale of counterfeit Coach merchandise at his flea market. (Kim Depo. Ex. 11 - MET317). Thus, the fifth factor - the defendant's willfulness - weighs in favor of a large damages award.

---

[4]  "Counterfeiters can trade on the investment of genuine business in quality and goodwill, reaping profits from the work of others. And often, because of the sophisticated computers and copying equipment, organized crime syndicates can reproduce the products for only a few dollars…Syndicates can generate millions of dollars in profit every year in what has been traditionally thought to be a low-risk criminal venture. Product counterfeiting is perceived to be low-risk because the perceived likelihood of being caught and punished is not very high and because the penalties, if caught, are not too great. The perception of counterfeiting as a high-profit, low-risk venture has enticed more and more organized crime syndicates into the business." S. Rep. No. 177, 104th Cong., 1st Sess., pt. 3. (1995).

In light of the factors above, Coach requests that this Court award it $400,000 per mark, per type of good infringed for a total award of 7.6 million. Plaintiffs came to this determination based on the following factors:

First, Kim's Flea Market is one of the largest sellers of counterfeit merchandise in the Southeast. The number of counterfeit Coach items seized by law enforcement is staggering. In cases involving counterfeiting of this scale, the damages requested by Coach are reasonable. For example, in *Perry Ellis Int'l v. URI Corp*, the court awarded Perry Ellis damages of $1,000,000 for one trademark infringed. In that case, the court emphasized the fact that defendants conduct was willful, intentional, and done with knowledge of Perry Ellis's rights. *Perry Ellis Int'l, Inc. v. URI Corp.*, 2007 U.S. Dist. LEXIS 77676 (S.D. Fla. Oct. 18, 2007). Similarly, in *Nike v. Top Brand Co.*, the court ordered the defendants to pay Nike $12,000,000 and Adidas $5,000,000 for trademark counterfeiting. In determining the amount of damages, the court relied on, amongst other things, the need "for redress for wrongful conduct". *Nike, Inc. v. Top Brand Co.*, 2006 U.S. Dist. LEXIS 76543 (S.D.N.Y. Feb. 27, 2006). Additionally, the court focused on deterrence, the defendant's possible profits, and the willfulness of defendant's conduct. These factors, all present in the instant case, justify Coach's request for $7,600,000 in damages.

35

Secondly, the Lanham Act allows for damages of up to two million dollars per mark, per type of good.  By requesting only $400,000 per mark, per type of good, Plaintiff is asking for only 20% of the legal maximum - even though the court could find that the Defendants' conduct is so shocking that a greater award is necessary.

Third, an award of $400,000 per mark, per type of good will serve to deter Mr. Kim from once again allowing his market to be a hotbed for counterfeiting and will discourage other flea market operators from this behavior as well.  Coach views its anti-counterfeiting program to serve as both a specific and general deterrent.  An award of $400,000 per mark, per good would serve both these functions.

An award of 7.6 million dollars is appropriate, and indeed conservation, reasonable when seen in relation to the defendants' conduct.

ii)     *Coach is entitled to damages of at least $480,000 for Contributory and Vicarious Copyright Infringement.*

Plaintiff can recover statutory damages under "both the Copyright Act and the Lanham Act where the defendant's conduct simultaneously infringe[s] the plaintiff's copyright and its trademark**.  *In re Mann***, 410 B.R. 43,49 (C.D. Cal. 2009 (citing *Nintendo of America v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994);  *Symantec Corp. v. Logical Plus, Inc.*, 2010 U.S. Dist. LEXIS 55110,

5-6 (N.D. Cal. June 4, 2010);  see also *Microsoft Corp. v. Tierra Computer, Inc.*,

184 F. Supp. 2d 1329, 1331 (N.D. Ga. 2001).

> Section 504(c) provides that the copyright owner, at any time before final judgment is rendered, may elect to recover statutory damages instead of actual damages and profits. 17 U.S.C. § 504(c). Statutory damages are awarded per copyrighted work infringed of between $ 750.00 and $ 30,000.00, at the discretion of the court. Id. Additionally, if the court finds that the infringement was willful, the court may raise the statutory award to $ 150,000.00 per infringed work at its discretion. 17 U.S.C. 504(c)(2).

*Disney Enters., Inc. v. Law*, 2008 U.S. Dist. LEXIS 6431 (M.D. Fla. Jan. 3, 2008)

Using the same analysis as provided for trademark infringement, the severity of the illegal action occurring at Kim's Flea Market warrants a significant financial damage award.  In light of that, Coach requests that the court award it $480,000 for the infringement of eight registered copyrights. This is in line with other decisions, and only 40% of the maximum statutory damage award allowed under the US Copyright Act.

### iii)    Coach is Entitled to a Permanent Injunction.

The Lanham Act provides that injunctive relief may be entered against a defendant who is shown to have willfully and intentionally violated the Plaintiffs' trademarks. Given Kim's Flea Market's history of counterfeiting, injunctive relief is of particular importance in this case.

It is well established that injury arising out of trademark infringement and public confusion causes irreparable harm. "Courts…subscribe to the rule that infringement of a trademark is, by its very nature, an activity which causes irreparable harm – irreparable in the sense that no final decree of a court can adequately compensate a plaintiff for the confusion which has already occurred." *Council of Better Business Bureau, Inc. v. Better Business Bureau of South Florida*, 200 U.S.P.Q. 282 (S.D. Fla. 1978); *Tally-Ho, Inc. v. Coast Community College District*, 889 F. 2d at 1029 (11th Cir. 1989). As such, the Lanham Act provides that injunctive relief may be entered against a defendant who is shown to have willfully and intentionally violated the Plaintiffs' trademarks. 15 U.S.C. § 1116.

As demonstrated above, Kim's Flea Market was the location to buy counterfeit merchandise in Atlanta and surrounding areas. During the five years Coach investigated Kim's Flea Market, dozens of vendors were arrested and thousands of counterfeit items were seized. Clearly Mr. Kim willfully allowed vendors to sell counterfeit Coach merchandise while completely ignoring the law. As such, injunctive relief is particularly important and Kim's Flea Market should be permanently enjoined from selling merchandise bearing counterfeits of the Coach trademarks.

## Conclusion

For all of the foregoing reasons, Coach respectfully  requests that this Court enter summary judgment against the Defendants and on behalf of Coach on counts X, X, and X and award damages in the amount of $8,080,000 for contributory trademark infringement, contributory copyright infringement, and vicarious copyright infringement.

This the 28th day of July, 2011.

*/s/ Ryan Isenberg*
Ryan L. Isenberg
Georgia Bar No. 384899
7000 Peachtree Dunwoody Rd
Building 15, Suite 100
Atlanta, Georgia 30328
770-351-4400 (Voice)
678-990-7737 (Fax)
Ryan@isenberg-hewitt.com

*/s/ Matthew Kilgo*
Matthew W. Kilgo
Georgia Bar No. 661570
135 Mt. Vernon Road, Ste. 200
Atlanta, Georgia 30338
770.685.6400 p
770.685.6403 f
mwkilgo@kilgolaw.com

*Attorneys for Plaintiffs*

## Certificate of Service

This is to certify that I have this day filed the foregoing using the CM\ECF system, which will deliver notice to counsel for the Defendants.

*/s/ Ryan Isenberg*